**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
mark@potterhandy.com
James M. Treglio (SBN 228077)
jimt@potterhandy.com
Isabel Rose Masanque (SBN 292676)
isabelm@potterhandy.com
Jason Kyle Masanque (SBN 351792)
jasonm@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated

## UNITED STATED DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW KLEIN on behalf of herself and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>TALKIATRY MANAGEMENT SERVICES, LLC, a Limited Liability Company; and DOES 1-100, inclusive,<br><br><br>Defendants. | CASE NO. _____<br><br>**CLASS COMPLAINT FOR VIOLATIONS OF:**<br>　(1) **PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);**<br>　(2) **CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);**<br>　(3) **ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and**<br>　(4) **WIRETAP ACT, 28 U.S.C. § 2510 *et seq*.**<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS COMPLAINT AND DEMAND FOR JURY TRIAL**

Class Representative Plaintiff Andrew Klein ("Plaintiff"), by and through their attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1.      Defendant TALKIATRY MANAGEMENT SERVICES, LLC ("Defendant") owns and operates a website, https://www.talkiatry.com/ (the "Website" or "Talkiatry's").

2.      When users visit the Website, Defendant causes trackers and cookies developed by Google, , Facebook, Tik Tok, and Microsoft (the "Trackers") to be installed on Website visitors' internet browsers. Defendant then uses these Trackers to collect Website visitors' identifying information, as well as dozens of other data points that reveal the users' behavior and activity on the Website.

3.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). Cal. Penal Code § 638.50(b); see also *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

4.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

5.      Because the Trackers also intercept information about the Website visitors' interactions with the Website, the Trackers constitute unlawful wiretapping under Section 631 of CIPA and Section 2511 of the Electronic Communications Privacy Act ("ECPA").

6.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA.

## PARTIES

7.      Plaintiff Andrew Klein resides in Ventura County, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when he visited the Website.

1

**COMPLAINT DEMAND FOR JURY TRIAL**

8.      Defendant Talkiatry Management Services, LLC, is a Limited Liability Company registered in the State of New York with its principal place of business located in New York City.

## VENUE AND JURISDICTION

9.      This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff, and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant, there are more than 100 putative Class Members, and the amount in controversy exceeds $5 million, exclusive of interest and costs. This Court has jurisdiction over Defendant because Defendant operates in and directs commerce to this District. Defendant intentionally avails itself of the markets within this District, rendering the exercise of jurisdiction by this Court just and proper. According to Defendant's website, Defendant's primary office location in California is located in this District. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1).

## FACTUAL BACKGROUND

### I.      THE CALIFORNIA INVASION OF PRIVACY ACT

10.      The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

11.      Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also *Greenley, supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in

2

**COMPLAINT AND DEMAND FOR JURY TRIAL**

accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

12.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

### A. The Trackers Are "Pen Registers" under Section 638.51

13.     CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

14.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

15.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

16.     In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

17.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

18.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

19.     To make Defendant's Website load on a user's internet browser, the browser sends

3

**COMPLAINT AND DEMAND FOR JURY TRIAL**

an "HTTP request" to Defendant's server where the relevant Website data is stored.

20. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.

21. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

22. In addition, the server's instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address—to Google, Facebook, Tik Tok, Microsoft.

23. The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

24. Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains geographical location.

25. Through an IP address, the specific device's state, city, and zip code can be determined.

26. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device. Thus, knowing a user's IP address—and therefore geographical location— "provide[s] a level of specificity previously unfound in marketing."[1]

27. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[2] and (ii) "to target specific households, businesses[,] and even

---

[1] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA, https://www.accudata.com/blog/ip-targeting/ (last visited January 27, 2025).

[2] *Location-based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargetingstrategies/ (last visited January 27, 2025).

**COMPLAINT AND DEMAND FOR JURY TRIAL**

individuals with ads that are relevant to their interests."[3] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[4] because "[c]ompanies can use an IP address … to personally identify individuals."[5]

28.    For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis.[6] Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[7]

29.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[8] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[9]

30.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[10] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[11]

31.    As alleged below, Defendant installs each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information—including, but not limited to, users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the Trackers are each "pen registers."

---

[3] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbertwilliams-z7bhf.

[4] *IP Targeting: Understanding This Essential Marketing Tool, supra note 1.*

[5] Trey Titone, The future of IP address as an advertising identifier, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[6] *See, e.g., IP Targeting: Understanding This Essential Marketing Tool, supra note 1.*

[7] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address, GEOFLI,* https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digitalmarketing-campaigns (last visited January 27, 2025).

[8] Williams, *supra note 3.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

5

**COMPLAINT AND DEMAND FOR JURY TRIAL**

32.    Public IP addresses enable companies to monitor user interactions and behaviors across various websites, and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

33.    They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

34.    By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

35.    For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

36.    In addition to IP addresses, the Trackers also collect browser and device information, unique identifiers, geolocation data, advertisings metrics, and other data, which is then used by Defendant to "fingerprint" individuals across the internet for Defendant's benefit, deriving revenue from the targeted marketing.

37.    When combined with additional data gathered by trackers (e.g., browser type, device type, and user behavior), these IP address patterns enable businesses to track specific individuals with notable precision.

38.    For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

39.    Tracking technologies, such as those described here, typically function by installing cookies on users' browsers. A cookie is a small text file with data created by a website's server and transmitted to a web browser, which then stores the file on the user's device. When the user revisits the website, the tracker accesses the cookie's information, allowing it to recognize the user and build sophisticated profiles. These cookies can remain on the device for anywhere from a few days to several years, enabling long-term tracking and profiling.

6

**COMPLAINT AND DEMAND FOR JURY TRIAL**

40.    When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

41.    Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their device, as the process occurs in the background without any visible signs.

42.    Through the use of tracking identifiers, the Website shares users' identifying information with at least seven different third parties: Google, TikTok, Microsoft, and Meta/Facebook Pixel.

### i. Google's Tracking Technology

43.    Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising bringing in a grand total of $305.6 billion.

44.    Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level.

45.    Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Google's advertising services. Google generates substantially all of its revenue from selling advertisement placements.

46.    Defendant uses Google Analytics ("Google Trackers") on its website to track user behavior across browsing sessions by assigning them unique identifiers.

47.    As soon as a user takes any action on a webpage that includes this code, the code embedded in the page re-directs the content of the user's communication to Google while the exchange of the communication between the user and website provider is still occurring.

48.    Through this technology, Google intercepts each page a user visits, what buttons they click, how far they scroll on the page, and the length of their session. The code sends each of these pieces of information to Google with other identifiable information, such as the users IP address. Google stores this data on its own server, in some instances, for years on end.

49.    Google Analytics can also derive demographic information about a user, such as age and gender, by associating the other data collected with the individual users' Google account. For example, if the user is logged into their Google account when the user visits Talkiatry's website,

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Google receives third party cookies allowing Google to link the data collected by the code to the specific Google user.

50.    Importantly, even if the code collects data about a non-Google user, Google still retains and uses the data collected through the code in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Google.

51.    Google describes how it uses information from websites that use its services as follows:

> For example, when you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there.[12]

52.    Because Google captures outgoing information from visitors to websites, it falls within the definition of a "pen register" for the purposes of CIPA section 638.50(b).

### ii. Tik Tok Pixel

53.    Defendant shares information with TikTok using TikTok Pixel, which is a snippet of source code site owners integrate onto their websites allowing them to track user activities and interactions.

54.    According to TikTok, the TikTok Pixel collects and reports supplemental metadata to TikTok in addition to IP addresses, such as timestamp (when the action took place), unique identifiers (cookies that are assigned to a user's device or browser session that distinguish one user from another), device details (make, model, operating system), as well as browser information.[13]. If a user has a TikTok account, TikTok's "AutoAdvanced Matching" feature can also associate information collected by the pixel to uncover their identity. For example, if a website asks the user to submit information such as e-mail or phone number, TikTok can match this information to a

---

[12] https://policies.google.com/technologies/partner-sites?hl=en-US

[13] *About Tik Tok pixel*, TIK TOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited March 6, 2025).

8

user's TikTok profile and identify them with relatively high accuracy. Importantly, website visitors can be identified by the TikTok pixel even if they do not have a TikTok account. Once the TikTok Pixel is installed, it installs a tracking cookie—called a "ttp cookie"—on the user's browser to identify and collect data about that user. TikTok collects as much as data as it can about the user and utilizes a process known as "fingerprinting" to match data collected from the pixel with data TikTok has previously acquired regarding millions of users. This allows TikTok to associate the information it obtained through the pixel with personally identifiable information.

55.    The TikTok Pixel is at least a "process" because it constitutes "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

56.    Further, the TikTok Pixel is also a "device" because "in order for software to work, it must be run on some kind of computing device." *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

57.    Because the TikTok Pixel captures outgoing information from visitors to websites, it falls within the definition of a "pen register" for the purposes of CIPA section 638.50(b).

### ii. Microsoft Bing

58.    Defendant also sends user information to Microsoft using "Bing," Microsoft's analytics and advertising tool. This tool allows site owners to track visitor actions on their websites and measure the effectiveness of their advertising.

59.    Site owners install the trackers by integrating the trackers' source code on their websites. Once the trackers are embedded in a website's source code, they send data regarding specific user actions and their unique identifiers to Microsoft.

60.    The Microsoft trackers are at least a "process" because they constitute "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

61.    Further, the Microsoft trackers are also a "device" because "in order for software to work, it must be run on some kind of computing device." *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

9

**COMPLAINT AND DEMAND FOR JURY TRIAL**

62.    Because the Trackers capture outgoing information from visitors to websites, they fall within the definition of a "pen register" for the purposes of CIPA section 638.50(b).

### iii. Meta/Facebook Pixel

63.    Facebook is a social media platform and social networking service that also offers an advertising and analytics tool called Facebook Pixel.

64.    The Meta/Facebook Pixel is a snippet of code integrated into a website that enables businesses to "measure, optimize, and build audiences" for their ad campaigns by tracking user actions and behavior.[14] Once installed, the pixel is activated as soon as a user visits a website.[15]

65.    Leveraging their access to its social media platform, Facebook Pixel goes beyond standard event tracking and uncovers the identity of users by matching website visitors to their respective Facebook profiles to later target them with ads on Facebook. Facebook explains: "Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns. By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."

66.    The Meta/Facebook Pixel is a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

67.    The Meta/Facebook Pixel is a "device" because "in order for software to work it must be ran on some kind of computing device." *James v. Walt Disney Co.*, --- F. Supp. 3d --- 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

68.    Because the Facebook Pixel captures outgoing information—including IP addresses—from visitors to websites, it is a "pen register" for the purposes of CIPA section 638.50(b).

### B.    Defendant Intercepts Communications Containing Information About User Behavior and Activity on the Website and Discloses the Information to Third Parties

69.    Not only do the Trackers collect identifying information about users, the Trackers are also used to monitor and capture user behavior and interactions across the Website.

---

[14] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel; https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[15] *Id.*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

70. For example, Defendants can control the "Events" that allow the Google to embed the code that transmits any information about the users action on the website and which in turn is analyzed for the purposed of delivering targeted advertising.

71. Similarly, the website owners can control the type of data the TikTok Pixel collects by selecting and defining the "Events" they want it to track and report. "Events" refer to specific actions and interactions taken by a website visitor, such as adding items to a cart, filling out forms, or making purchases.

72. Like the TikTok Pixel, in addition to identifying an individual user, the Facebook pixel continuously receives information about the user's actions on the website—categorized as "events"—and sends this information back to the website owner to view and analyze for purposes of delivering targeted advertising.[16]

73. Facebook Pixel has a set of pre-defined "standard events" that can track when a user adds an item to their cart, adds payment information, adds an item to their wish list, customizes a product, submits a form, performs a search, or views content on a particular page.

74. Similarly, Microsoft Bing tracks users by assigning them unique cookie-based identifiers, allowing the service to monitor user behavior across sessions and devices.

75. Because the Trackers intercept information about the Website visitors' interactions with the Website, the Trackers constitute an "unauthorized connection" which "reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication" under Section 631 of CIPA.

76. Defendant's conduct also constitutes an unlawful interception and disclosure of an "electronic communication" under Section 2511 of the ECPA.

**C.    Defendant Installed And Used The Trackers On Plaintiff's and Users' Browsers Without Prior Consent Or A Court Order**

77. Defendant owns and operates the Website, https://www.talkiatry.com/, which is an online platform that provides in-network psychiatry and therapy.

---

[16] *Id.*

11

**COMPLAINT AND DEMAND FOR JURY TRIAL**

78.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[17]

79.    Often times, third-party scripts are installed on websites "for advertising purposes."[18]

80.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[19]

81.    Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and other users visited the Website. Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

82.    As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser.

83.    Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the identifying information and the Website activity and Class Members.

84.    The operators of the Trackers then use the correlated information of users, including those of Plaintiff and Class Members, to serve targeted advertisements and conduct website analytics.

85.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**D. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

---

[17] *See THIRD-PARTY TRACKING*, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[18] *Id.*

[19] *Id.*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

86. The collection of Plaintiff's and Class Members' personally identifying, non anonymized identifying information, and Website activity through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

87. As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

### III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES

88. Plaintiff Andrew Klein has visited the Website on or around June 2025 using a Google Chrome browser.

89. When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browsers.

90. Defendant used the information collected by the Trackers and shared it with third parties to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's locations, and ultimately boost Defendant's and advertisers' revenue. Plaintiff did not provide prior consent to Defendant to install or use the Trackers on their browser.

91. Defendant did not obtain a court order before installing or using the Trackers.

92. Plaintiff has, therefore, had their privacy invaded by Defendant's violations of CIPA section 638.51(a).

93. Although Defendant uses at least several different Trackers on the Website, they all operate in the same manner and perform the same function, i.e., collecting Plaintiff's and Class Members' identifying information and Website activity. Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the purpose of collecting IP addresses and other event data associated with the Plaintiff and Class Members.

94. Plaintiff and Class Members did not provide their prior consent to Defendant to install or use the Trackers on their browsers.

95. Defendant did not obtain a court order before installing or using the Trackers.

96. Thus, like Plaintiffs, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a).

### CLASS ACTION ALLEGATIONS

**COMPLAINT AND DEMAND FOR JURY TRIAL**

97.    Class Representative Plaintiff brings this action on their own behalf and on behalf of all other persons similarly situated.  The putative class that Class Representative Plaintiffs seek to represent is composed of:

> All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent (hereinafter the "Class").

98.    Excluded from the Class are the natural persons who are directors, and officers, of the Defendant.  Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

99.    Plaintiff is informed and believe that the members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Class Representative Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

100.    There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendant violated CIPA section 638.51(a);
(b)    Whether Defendant violated the Wiretap Act, 28 U.S.C. section 2510 et seq.
(c)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);
(d)    Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;
(e)    Whether Defendant sought or obtained a court order for its use of the Trackers; and
(f)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

14

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiffs, like every other Class member, were exposed to virtually identical conduct and are entitled to the same relief under the CIPA.

102. Class Representative Plaintiff will fairly and adequately protect the interests of the Class. Moreover, Class Representative Plaintiff has no interest that is contrary to or in conflict with those of the Class they seek to represent during the Class Period. In addition, Class Representative Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intend to prosecute this action vigorously.

103. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendant in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

104. Proper and sufficient notice of this action may be provided to the Class members through direct mail.

105. Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the trap and trace practices of Defendants.

## COUNT I

### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 630, et seq.(a)

106. The allegations of the preceding paragraphs are incorporated by reference as if fully

15

**COMPLAINT AND DEMAND FOR JURY TRIAL**

set forth herein.

107. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

108. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

109. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

110. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

111. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

112. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

113. At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, and used the Trackers to collect identifying information of Plaintiff and Class Members, including IP addresses.

114. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

115. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any

16

**COMPLAINT AND DEMAND FOR JURY TRIAL**

machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

116.   Defendant used tracking software on the Website to intercept and collect information about Website visitors' behavior and activity on the Website, including their search terms, page views, and purchases.

117.   Defendant did not obtain a court order to install or use the Trackers.

118.   Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA section 638.51(a).

**COUNT II**

**Violation of the California Computer Data Access and Fraud Act**
**(California Penal Code § 502)**

119.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

120.   The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

121.   The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer

17

systems, and data." Cal. Penal Code § 502(a).

122. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

123. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

124. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

125. Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

126. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

127. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address are both "data" within the meaning of the statute.

128. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

129. The statute also makes it unlawful to knowingly access and without permission take,

18

**COMPLAINT AND DEMAND FOR JURY TRIAL**

copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

130. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

131. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

132. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

133. Similarly, the installation of these third-party tracker cookies violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

134. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

135. Further, Defendant's unauthorized collection and disclosure of Plaintiff's and Class members' personally identifying and addressing information to undisclosed third parties violates Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class members' computers, computer systems, or computer networks.

136. Plaintiff and Class members are citizens of California, and used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data and other personally identifying information from

19

**COMPLAINT AND DEMAND FOR JURY TRIAL**

within California.

137. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the Website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

138. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

139. Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

## COUNT III

### Invasion of Privacy
### (Violation of Art. 1, § 1, California Constitution)

140. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

141. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

142. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

143. Plaintiff and Class members have a legally protected privacy interest in their

20

**COMPLAINT AND DEMAND FOR JURY TRIAL**

personally identifying information and addressing information that are captured, without notice or consent, when they access and view the Website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

144. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class members were not aware of and could not have reasonably expected that Defendant would use website tracking technology and install third-party tracker cookies without notice or obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiff's and Class members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

145. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) collection and disclosure to third parties of Plaintiff's and Class members' personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class members, are an invasion of Plaintiff's and Class members' privacy.

146. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the Website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

147. As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

148. Plaintiff and the Class members seek appropriate relief for that Injury, including but not limited to restitution, disgorgement of profits earned by Defendant as a result of or in connection

21

**COMPLAINT AND DEMAND FOR JURY TRIAL**

with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

149. Plaintiff also seeks such other relief as the Court may deem just and proper.

<u>**COUNT IV**</u>
**Violation of the Wiretap Act**
**Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq.*)**

150. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

151. The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

152. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

153. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

154. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

155. Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

156. Defendant is a corporation and is therefore a "person" for purposes of § 2510(6).

157. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(a) when it installed Trackers on Plaintiff's browsers, which then intercepted and collected Plaintiff's identifying information, as well as dozens of other data points that revealed Plaintiff's and Class Members' behavior and activity on the Website without their consent.

158. When Plaintiff and Class Members accessed Defendant's website, Defendant

**COMPLAINT AND DEMAND FOR JURY TRIAL**

violated 18 U.S.C. § 2511(1)(c) when it disclosed Plaintiff's and Class Members' identifying information, behavior, and activity, obtained from the Trackers to third parties without their consent.

159. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) when it used Plaintiff's identifying information, behavior, and activity obtained from the Trackers for its own advertising and marketing purposes without their consent.

160. As a result of Defendant's violations of the Wiretap Act, Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights, loss of their information and loss of money and costs incurred, all of which have ascertainable value to be proven at trial.

161. Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

## DEMAND FOR JURY TRIAL

162. Plaintiff and the Class hereby demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. For an order certifying the Class, naming Plaintiff as the representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

2. For an order declaring that Defendant's conduct violates the statutes referenced herein;

3. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

4. For statutory damages of $5,000 for each violation of CIPA section 638.51(a);

5. For statutory damages of $10,000 for each violation of the Federal Wiretap Act;

6. For pre- and post-judgment interest on all amounts awarded;

7. For an order of restitution and all other forms of equitable monetary relief; and

23

8.  For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: August 13, 2025                              **POTTER HANDY LLP**


                                                   /s/ James M. Treglio


                                        By: _____
                                             Mark Potter, Esq.
                                             James M. Treglio, Esq.
                                             Isabel Rose Masanque, Esq.
                                             Jason Kyle Masanque, Esq.
                                             Attorneys for Plaintiffs

**COMPLAINT AND DEMAND FOR JURY TRIAL**